Gilmore, C. J.
These applications may be disposed of together. It is incumbent on the relators, in order to succeed, to show that they have a clear legal right to have the contract awarded to him or them, as the case may be; for on no other ground can an award be ordered and enforced in favor of either of them. Before the contract can be .awarded, therefore, the party must show that all the requirements of the law under which the‘ proposal for the ■contract was made, have been substantially complied with.
It is perfectly apparent that the legislature intended that the work of annotating, printing, binding, and publishing the revised statutes should be done in the shortest time that was practicable for the performance of so important an undertaking.
It is clear that five months — i. e., from July first to December first — was deemed sufficient for the purpose.
The statute, in all its parts, is so framed as to effect the object within the time named.
The 3d section (76 Ohio L. 192) provides that the annotators shall do their work in such a way that the “ volumes shall be completed and ready for distribution not later than December 1, 1879.”
The 13th section, among other things, requires the annotators “to give bond in $10,000, to be approved by the secretary of state, for the faithful performance of their duties within the time herein prescribed, and shall supply the *138 copy required to complete said work within the time to be named in the contract aforesaid.” The words “ contract aforesaid” refer to the contract for printing which had been previously provided for in the act, and which will now be noticed.
Section 4 prescribes the size of the page, the quality and size of type, electrotyping, etc.
Section 5 reads as follows:
“ The attorney-general, together with the secretary of state and supervisor of public printing, shall, immediately after the passage of this act, insert for at least five days in two newspapers in each of the cities of Columbus, Cleveland, and Cincinnati, a notice that sealed proposals will be received at the office of the attorney-general for the paper, composition, electrotyping, and press-work of said publication. Said notice shall specify the number required, the quality and style of the printing, electrotyping, and press-work, which shall all be of the best quality, and samples, including ink, shall accompany each bid; the proposals shall distinctly and specifically state the price per thousand ems for composition, the price for electrotyping, the price per token for press-work, and also for furnishing the necessary quantity of strictly number one book paper, supersized and calendered, upon which said work shall be printed, and shall state the time when said work shall be completed; each proposal shall be accompanied by a bond executed in due form by the bidder, with at least two good and sufficient sureties, satisfactory to the attorney-general, in the sum of twenty thousand dollars, conditioned for the faithful performance of the contract, if the same be awarded to him, and for the payment as liquidated damages by such bidder to the state of two hundred dollars for each day such work is unreasonably delayed by such contractor, and any excess of cost over the bid of such bidder which the state may be obliged to pay for such work by reason of the failure of such bidder to complete his contract, the bond to be null and void if no contract be awarded to him; *139 and a bid unaccompanied by such bond shall not be entertained; provided, that the whole cost under such bids shall not exceed four dollars per copy for both volumes, the computation to be made by the secretary of state, attorney-general, and the supervisor of public printing; and provided further, that after such bids shall have been accepted, a contract shall be entered into with such parties to whom the same may be awarded by the attorney-general, acting for the state, providing that one-fourth part of each payment, to be made as therein directed, shall be retained until the conditions of said contract shall have been fulfilled.”
The advertisements that were published followed the requirements of the section, which, among other things, required the proposal to state “ the time when said work shall be completed.”
Now as the law requires the work as a whole to be completed and ready for distribution not later than December 1, 1879, a reasonable construction of it would indicate clearly that the printing would have to be done and completed a sufficient time before the first of December, 1879, to allow the volumes to be bound and prepared for distribution by that time; and a proposal that did not fix a time for completing the printing by a date that would allow a reasonable time for binding the volumes so that they might be ready for distribution by the time required by the law, would not be a bid that the defendants were authorized, under the law, to accept.
The acceptance of the proposal of Peter Q-. Thompson would not have required him to complete the work awarded to him until the 1st of December, the time when, under the statute, the volumes were to be ready for distribution. This would leave no time for binding. The defendants, therefore, can not be required to accept his proposal.
The proposal of the Transcript Company is like that of Thompson, except that it contains the condition, “ or thirty days sooner, if copy is furnished.”
*140 The provision of the statute, requiring the proposal to state the time when the work will be completed, is intended to accomplish a double purpose: 1. To fix the time within which the bidder must complete his work; 2. To fix the time within which the annotators are bound to supply the bidder with the copy required to complete the work.
Under a contract made on the basis of the proposal of the Transcript Company, the annotators could not be required to supply copy faster than would enable the company to complete their work by the time named in the proposal, the 1st of December, 1879. Under the statute, the time allowed to the bidder, by his contract, to complete his work, is the standard by which the annotators are bound to supply him with copy. He can not, therefore, make the time of supplying him with copy a substitute for stating the time within which he undertakes to complete the work.
Any delay caused by failing to furnish the bidder with copy, would not be unreasonable delay on his part, and would not subject him to damages. For delay thus caused, the annotators would be liable under section 13 of the act.
The proposal of the Transcript Company is not, therefore, under the statute, different, in legal effect, from the proposal of Thompson.
The demurrer to the writs respectively must be sustained on the ground above indicated, and it is unnecessary to examine the other grounds stated in the demurrer.